# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CR-0011-CVE |
| | ) | |
| CHRISTOPHER LEE CASKEY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion to Suppress Evidence Obtain [sic] in Unlawful Arrest (Dkt. # 21). Defendant Christopher Lee Caskey moved to suppress evidence, arguing that he was unlawfully arrested because officers of the Tulsa Police Department (TPD) arrested him outside of the city limits of Tulsa, Oklahoma. Dkt. # 21. Plaintiff filed its response in opposition to the motion (Dkt. # 25), and an evidentiary hearing was held on March 12, 2018.

## I.

On December 13, 2017 at 10:46 a.m., a person wearing a hoodie, a baseball cap, and sunglasses walked into the Arvest Bank located at 4825 East 36th Street in Tulsa. The person also had dark make-up on his face to make it appear that he had a beard and was wearing yellow gloves. The person carried what appeared to be a semi-automatic pistol, and he approached a bank teller. The person was carrying a pillow case and he told the teller to "Give me all your money!" A bank teller and a bank customer heard the robber mention detonating a bomb. Two tellers put money from their drawers into the pillow case, and they also put two GPS tracking devices with the money. One of the tellers handed the robber the pillowcase, and the person left the bank at approximately 10:47 a.m.

One of the bank tellers activated her alarm notifying TPD of the robbery. However, TPD had received a call a short time before the robbery that someone had placed an explosive device in the parking lot of the nearby Patrick Henry School, and the caller said that the device would explode if anyone attempted to exit the school. Subsequent investigation showed that the call to TPD originated from a phone belonging to Caskey's mother, and Caskey's mother was found in Caskey's vehicle when he arrested. About five minutes before the bank robbery, Caskey called 911 and told the operator that his car had been stolen from a QuikTrip located near 51st East Avenue and Yale Avenue. The caller claimed that his three year old son and his six year old daughter were in the stolen vehicle, and he told the operator the vehicle had pulled into an apartment complex behind the QuikTrip. When the 911 operator sought more information, Caskey stopped responding but the call did not end, and his voice and his mother's voice could be heard on the phone. Caskey can be heard on the phone commenting about the hoax 911 call.[1] The 911 operator did put out a dispatch concerning the stolen vehicle and the possible abduction of children, and police resources were used to investigate the 911 call while Caskey was attempting to evade police pursuit from the bank robbery.

By 10:48 a.m., the GPS trackers were operational and the trackers showed that the vehicle used by the robber was heading north on Winston Avenue. The dispatch call was initially being handled by Melissa Randolph, but she was also handling other calls at the same time. The dispatch for the bank robbery was designated as tactical, and the dispatch was handled by a single dispatcher,

---

[1]     There is no evidence that the dispatcher communicating with police about the pursuit of the bank robbery suspect knew about statements that Caskey or his mother made during the 911 call. The Court has reviewed the recording of the 911 call submitted by the government, but finds that it is not relevant to the probable cause analysis.

Gary Applegate, who worked only on the bank robbery call. Applegate called out information about the location of the trackers over the dispatch, but TPD Detective Paul Baroni testified that he could also view the tracking data on his cell phone and laptop computer. The trackers remained operational until the vehicle was stopped by police at 11:13 a.m. In addition to the tracking data, Applegate provided the pursuing officers with a description of the suspect. TPD officers began pursuit of the vehicle using GPS information provided by dispatchers, and the pursuit continued on eastbound Highway 412 leaving the city limits of Tulsa. Dispatch calls show that the pursuing TPD officers were aware that they were leaving the city limits, and at least one TPD officer suggested that the dispatcher call tribal law enforcement officials in the event the suspect were to go to a casino. Applegate directed another dispatcher to notify the Oklahoma Highway Patrol, the Catoosa Police Department, and the Tulsa County Sheriff's Office about the pursuit. TPD officers pulled over several vehicles on Highway 412 in an attempt to stop the fleeing suspect within city limits, but police were unable to locate the suspect before he left the city limits of Tulsa. Baroni testified that he eventually caught up to the location of the tracker and he approached the vehicle he suspected contained the tracker, but he observed only a female driver and he did not see the male suspect identified by the dispatcher.[2]

TPD Officer James Isgrig was on patrol near the Arvest Bank when the call went out concerning the pursuit of the bank robbery suspect. He joined the pursuit and continued to receive updates from the dispatcher as the pursuit continued eastbound on Highway 412. Isgrig observed a silver Dodge Nitro turn off Highway 412 onto North 305th East Avenue, and he did not observe

---

[2]     Evidence of conversation overheard in the vehicle between Caskey and his mother during the 911 call suggests he ducked down so as not to be seen. Gov't Ex. 1, at 21:39-21:47.

any other vehicles in the vicinity. At the same time, he received a report from the dispatcher that the vehicle being pursued had just turned onto North 305th East Avenue. Isgrig's dashcam video shows that he almost drove past North 305th East Avenue, but he was able to slow down in time to maintain pursuit of the vehicle. Isgrig followed the Dodge Nitro and attempted to stop the vehicle, but the vehicle did not immediately stop. The vehicle turned right onto East Admiral Place and Isgrig continued to pursue the vehicle. The vehicle eventually stopped and the GPS tracking data shows that the tracker stopped moving as soon as the silver Dodge Nitro came to a stop. Isgrig placed Caskey and his mother under arrest. TPD officers searched the vehicle and found a pellet gun, sunglasses smudged with makeup, a broken cell phone, makeup, yellow gloves, a hoodie, a baseball cap, and a large amount of cash. The cash included the bait bills and the GPS tracker placed with the stolen money.

## II.

Defendant argues TPD officers arrested him outside of the city limits of Tulsa, and they had no authority to arrest him outside of their jurisdiction. He asserts that the arrest was invalid as a matter of Oklahoma law, and he asks the Court to suppress all evidence that was seized as a result of the unlawful arrest. At the suppression hearing, defense counsel represented that defendant's motion to suppress is based solely on state law. The government responds that police were in "hot pursuit" of defendant and police had probable cause to arrest defendant after stopping his vehicle. The government also argues that there is no distinction between pursuit of the GPS tracker and the visual pursuit of a vehicle as suggested by defendant.

Both parties assume that the location where defendant was arrested or where probable cause was established is a significant factor in determining whether defendant was lawfully arrested. Dkt.

# 21, at 4; Dkt. # 25, at 5. However, the Tenth Circuit has clearly explained that state law may be relevant to the reasonableness analysis under the Fourth Amendment, but state law is "'highly determinative' only when the constitutional test requires an examination of the relevant state law or interests." United States v. Gonzales, 535 F.3d 1174, 1184 (10th Cir. 2008); see also United States v. Mikulski, 317 F.3d 1228 (10th Cir. 2003) ("The officers' violation of state law is not, without more, necessarily a federal constitutional violation."). Individual states may place constraints on police officers that go beyond the requirements of the Fourth Amendment, but the rules governing a search or seizure under the Fourth Amendment remain the same regardless of in which state the search or seizure occurs. Virginia v. Moore, 553 U.S. 164, 172-73 (2008). The Tenth Circuit has clearly held that police do not violate the Fourth Amendment merely by arresting a person outside of jurisdictional boundaries established by state law. United States v. Jones, 701 F.3d 1300, 1311-12 (10th Cir. 2012). In Jones, Missouri Highway Patrol officers arrested a suspect in Kansas City, Kansas, and the defendant sought to suppress evidence because he was arrested in violation of Missouri law. Id. at 1307. The Tenth Circuit stated that it is "well established in this circuit that in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by *Federal* law even though the police actions are those of state police officers." Id. at 1309 (quoting United States v. Green, 178 F.3d 1099, 1105 (10th Cir. 1999) (emphasis added)). "While 'compliance with state law may be relevant to our Fourth Amendment reasonableness analysis' in some circumstances, 'we have never held it to be determinative of the constitutionality of police conduct.'" Id. at 1309 (quoting Gonzales, 535 F.3d at 1182). The Tenth Circuit examined its prior decisions involving an arrest by a state police officer outside of his own municipality or jurisdiction, and rejected the defendant's argument that a warrantless arrest by a

state police officer outside of state-imposed jurisdictional boundaries violates a person's rights under the Fourth Amendment. Id. at 1312. The Tenth Circuit found that no significant state law interests were implicated by the extra-jurisdictional arrest of the defendant, and it concluded that "whether the Missouri officers were acting without authority under state law (that is, Kansas law) is essentially irrelevant. Id. at 1310.

Defendant's motion to suppress is based solely on state law concerning the authority of a police officer to act outside his jurisdiction, but this is not a basis, by itself, to find that a constitutional violation occurred. The Court will consider the location of the stop as part of the totality of the circumstances in considering whether a violation of the Fourth Amendment occurred when defendant was arrested. The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. CONST. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" United States v. King, 990 F.2d 1552, 1559 (10th Cir. 1993) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)). In balancing these interests, the Supreme Court has held that arrests, being the most intrusive of Fourth Amendment seizures, are reasonable only if supported by probable cause. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007); United States v. Davis, 94 F.3d 1465, 1468 (10th Cir. 1996). Probable cause exists when a police officer has sufficient information "to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). This is an objective standard and a court must consider the totality of the circumstances to

determine whether a reasonable officer would have believed there was probable cause to make an arrest. Koch v. City of Del City, 660 F.3d 1228, 1239 (10th Cir. 2011). Probable cause "is measured at the moment the arrest occurs and must derive from facts and circumstances based on reasonably trustworthy information." Cortez v. McCauley, 478 F.3d 1108, 1121 (10th Cir. 2007).

Defendant argues that police were not really conducting a pursuit of his vehicle but, instead, they were "pursu[ing] a dot on a computer screen as instructed by dispatch." Dkt. # 21, at 5. He claims that police were blindly pulling over vehicles on Highway 412 in an attempt to locate defendant's vehicle before he left the city limits, and they knew they were headed outside of their jurisdiction. Id. at 2-3. The Court has reviewed defendant's motion to suppress, and he has not cited a single federal case in an attempt to show that he was arrested in violation of the Fourth Amendment. Defendant was arrested by Isgrig; thus, the Court must consider what facts were known by Isgrig when he took defendant and his mother into custody. Isgrig was pursuing defendant's vehicle based on information relayed to him by a dispatcher, and the dispatcher was providing information about the vehicle's location and speed based on the GPS tracker placed with the stolen money. Applegate testified that he provided pursuing police officers a description of the suspect. Isgrig had been pursuing the vehicle on Highway 412 and he received a dispatch that the vehicle had turned south onto North 305th East Avenue. Isgrig saw a white or silver Dodge Nitro turn onto North 305th East Avenue and there were no other vehicles in the area. Isgrig's dashcam video shows that he was almost unable to slow down in time to turn onto North 305th East Avenue, but he was able to turn onto North 305th East Avenue and he maintained visual contact with the vehicle. He was eventually able to stop the vehicle after it turned onto East Admiral Place, and he

placed the occupants under arrest. The GPS tracking data shows that the tracker stopped moving when Isgrig stopped the silver Dodge Nitro.

The Court finds that Isgrig had probable cause to believe that the occupants of the vehicle were the persons who robbed the Arvest Bank. Isgrig received updates from the dispatcher to aid him in pursuit of the bank robber, and he saw a vehicle turn onto North 305th East Avenue with no other vehicle in the immediate area. The dispatcher notified him that the GPS tracker showed that the suspect had just turned onto North 305th East Avenue, and this would lead a reasonable police officer to believe that the silver Dodge Nitro was the vehicle being pursued. The fact that the vehicle did not immediately stop could also have been considered by Isgrig as a factor that the occupants of the vehicle were attempting to avoid contact with police. Isgrig had a sufficient factual basis to believe that he had found the vehicle being driven by the person who robbed the Arvest Bank, and he had probable cause to stop the vehicle and arrest Caskey and his mother.

Defendant argues that the arrest occurred outside of the city limits of Tulsa, and Isgrig knew that he was conducting an extra-jurisdictional arrest. However, this is not a significant factor when analyzing the validity of an arrest under the Fourth Amendment. The Tenth Circuit explained in Jones that non-compliance with state law does not typically have any bearing on whether a person was arrested in violation of the Fourth Amendment. Jones, 701 F.3d at 1312. The Court also notes that defendant purposefully engaged in conduct to divert police resources and make it more difficult for TPD officers to effect an arrest within the city limits of Tulsa. Defendant used his mother's phone to call in a hoax bomb threat to a school and he made a false 911 call concerning the abduction of children, so police had fewer resources to devote to the pursuit of defendant. Considering the totality of the circumstances, the Court finds that it was reasonable to continue the

pursuit of defendant outside the city limits of Tulsa and defendant was lawfully arrested under the Fourth Amendment.

Defendant's argument concerning the extra-jurisdictional conduct of TPD officers does not show that his arrest was invalid under federal law, and police had probable cause to believe that the occupants of the silver Dodge Nitro were the persons who robbed the Arvest Bank. Defendant's motion to suppress (Dkt. # 21) is denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence Obtain [sic] in Unlawful Arrest (Dkt. # 21) is **denied**.

**DATED** this 13th day of March, 2018.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE